UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

United States of America,

   Plaintiff,

  vs.       REPORT AND RECOMMENDATION

Juan Valencia-Meraz,
a/k/a Noe Rivera Torres,
a/k/a Valentin Castellanos-Meraz

   Defendants.   Crim. No. 06-82(PAM/RLE)

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Juan Valencia-Meraz:

  1.  The Defendant's Motion to Suppress.

  2.  The Defendant's Motions to Dismiss.

  3.  The Defendant's Motion to Strike.

A Hearing on the Motions was conducted on April 18, 2006, at which time, the Defendant appeared personally, and by Bruce D. Nestor, Esq.; and the Government appeared by Trisha A. Tingle, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motion to Suppress be granted, in part, and denied, in part; that his Motion to Dismiss be denied; and that his Motion to Strike be granted.[1]

## II.  Factual Background

The Defendant is charged with one Count of Illegal Re-Entry After Deportation, in violation of Title 8 U.S.C. §§1326(a), and 1326(b)(2), and Title 6 U.S.C. §§202(3), 202(4), and 557.  The alleged violation is said to have occurred on or about December

---

[1]Following the Hearing, and without leave of the Court, the Defendant filed a Motion to Strike Surplusage, and the Government filed a Motion for Judicial Notice. To date, the Defendant has not filed any response to the Government's Motion for Judicial Notice, which we have deferred to the District Court, the Honorable Paul A. Magnuson presiding.  We now grant leave to the Defendant to file his Motion to Strike, and we note that the last brief on the issues, that were raised by that Motion, was received on May 1, 2006, at which time, the Motions were taken under advisement.  See, Title 18 U.S.C. §3161(h) (1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 767-77 (8th Cir. 1995).

30, 2005, in this State and District.  As pertinent to the charge, and to the Motions

pending before us, the operative facts may be briefly summarized.[2]

At the Hearing, Daniel Greenwald ("Greenwald"), who is an investigator with

the St. Cloud Police Department, and the Central Minnesota Drug Task Force ("Task

Force"), and Michael Becker ("Becker"), who is a Special Agent with the United

States Department of Homeland Security, Immigration and Customs Enforcement

("ICE"), testified at the instance of the Government.

According to Greenwald, in November of 2005, the Task Force began to

investigate an individual, who he identified as Ernesto Hernandez-Cortes ("Cortes"),

for possible involvement in the distribution of narcotics.   [T. 11].   As part of this

investigation, officers with the Task Force arranged for a Confidential Informant

("CI") to conduct two controlled purchases of methamphetamine from Cortes in

November of 2005.   [T.12].   Surveillance was conducted during both of those

---

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

transactions and, as a result, Greenwald became familiar with the appearance of Cortes. [T. 12].

On December 8, 2005, the CI made arrangements with Cortes for a third controlled purchase of methamphetamine. During a telephone conversation between Cortes and the CI, Cortes agreed to provide the CI with an amount of methamphetamine, but he advised the CI that he needed to meet with another person, and that they would then travel to the Minneapolis/St. Paul area to obtain the methamphetamine. [T. 13, 16]. Arrangements were made for the transaction to take place in St. Cloud, Minnesota, upon Cortes's return. [T. 13].

Shortly after the conversation between the CI and Cortes, officers who were conducting surveillance near a trailer home where Cortes was believed to reside, observed Cortes leave his residence in a blue 1991 Lincoln Town Car, which had been described by the CI. [T. 13]. Cortes was accompanied by another Hispanic male, who was later identified as Alvaro Valdovios-Moreno ("Moreno"). [T. 14]. The two men drove to another trailer park, which was located near Avon, Minnesota, where they picked up a third individual, who was later identified as the Defendant. After stopping at a gas station in Avon, the three men drove to Interstate 94, where they proceeding in an eastbound direction, towards the Minneapolis/St. Paul area. [T. 15-16]. Lacking

sufficient personnel, the Task Force ended its surveillance of the vehicle after approximately thirty (30) minutes, near Monticello, Minnesota, which is located between St. Cloud and the Minneapolis/St. Paul area.

Approximately four (4) to four and one-half (4½) hours later, the officers recommenced their surveillance of the vehicle, which was traveling westbound on Interstate 94 towards St. Cloud.  According to the testimony of Greenwald, the officers were apprised of Cortes's whereabouts, after a telephone conversation between Cortes and the CI, in which the Cortes informed the CI when and how he would be traveling back to St. Cloud.  [T. 17].  The CI also reported that Cortes had represented that he had approximately four (4) to five (5) ounces of methamphetamine that he would sell to the CI.  After following Cortes for some distance, arrangements were made to conduct a traffic stop of Cortes' vehicle near the exit ramp from Interstate 94 to St. Cloud.  [T. 17].

Greenwald testified that, following the traffic stop, a search of the vehicle was conducted, which did not result in the discovery of any controlled substances.  Nevertheless, Cortes was arrested, while Moreno and the Defendant, who identified himself to the officers as Valentin Castellanos-Meraz, were "detained" for questioning.  [T. 18-19, 28-29].  All three men were placed in handcuffs, and

transported by the officers to the Stearns County Jail to be booked and identified. [T. 19]. During a search, which was conducted as part of the booking process at the Jail, the booking officers discovered a white powdery substance in the Defendant's jacket pocket, which tested positive for cocaine. As a result of that discovery, and information that was apparently obtained from unidentified "individuals" at the Stearns County Law Enforcement Center, the Defendant was formally placed under arrest. [T. 19, 29-30].

The Record does not clearly articulate the sequence of events during, and immediately after, the Defendant's arrest. However, it does reflect that the Defendant's fingerprints were taken as a part of the booking process, [T. 27], and that, at the time of his arrest, the Defendant produced identification in the form of an International Driving Document, which identified the Defendant as Valentin Castellanos-Meraz. [T. 20]. The Record also reflects that, at sometime after the Defendant had been handcuffed and transported to the Jail, either Moreno or Cortes implicated the Defendant in drug related activities. [T. 44-45]. Nevertheless, all three men were subsequently released, without a Court appearance, in order to facilitate the ongoing narcotics investigation. [T. 20].

On December 9, 2005, the Defendant and another individual, who was later identified as Maurio Villanueva ("Villanueva"), arrived at the Stearns County Law Enforcement Center, in order to recover property that had been confiscated from the Defendant during his arrest.  [T. 20-21, 25].  During this encounter, the Defendant again identified himself as Valentin Castellanos-Meraz, and the Defendant's property was returned to him.  [T. 21].

Sometime on or around December 30, 2005, officers with the Task Force received an anonymous tip through the Stearns County Sheriff's Department that there was an unusual amount of vehicle traffic going to and from a specifically identified trailer home in the Avon trailer park, and that the tipster believed that the residents of the trailer home were involved in drug trafficking.  [T. 22].  Subsequently, on December 30, 2005, officers who were conducting surveillance of the trailer home, in response to the tip, observed the Defendant leave the identified trailer home, and drive to a car dealership in Avon, before driving to a gas station.  [T. 22].  After the Defendant had parked his vehicle at the gas station, Greenwald approached him, greeted him, and inquired as to whether the Defendant had gotten a Minnesota driver's license yet, or whether he had a valid license from anywhere else.  [T. 21, 36-37].  The Defendant advised Greenwald that he did not.  [T. 21].  Greenwald informed the

Defendant that he had been driving without a driver's license in violation of Minnesota law, and he placed the Defendant under arrest. [T. 22].   After the Defendant was arrested, he produced a Minnesota State Identification card, which contained a photograph, in the likeness of the Defendant, but which identified him as Noe Rivera-Torres.    [T.22-23, 38].   The Defendant advised Greenwald that his understanding of the English language was limited, but he maintained that the Minnesota State Identification card was genuine, and that the identification documents, which had been provided during the arrest of December 8, 2005, were not. [T. 24].

The Defendant was subsequently transported by a uniformed Stearns County Sheriff's Deputy to the Jail, where he was booked, and his fingerprints were taken. [T. 24, 27].  Approximately $600.00 in United States currency, a cellular telephone, and some paper documents, were discovered in the Defendant's possession during a search incident to that arrest.  [T. 25].  However, no drugs were discovered during a search of the Defendant's vehicle, and the Defendant was released from custody later that day.  [T. 25, 35].

On January 3, 2006, the Defendant and Villanueva arrived at the Stearns County Law Enforcement Center, in order to request the return of property that had

been confiscated during the Defendant's arrest on December 30, 2005. [T. 25].   The

Defendant's property was not returned to him at that time, because it was deemed to

be evidence in a drug investigation.   However, Villanueva was a resident of the trailer

home where the tipster had reported drug related activities, and while he was at the

Law Enforcement Center, Greenwald inquired about the reports of drug activity at the

trailer home.   Villanueva denied any such activities, and offered to allow the officers

to search his trailer home.  [T. 26].

Following this conversation, Greenwald drove to Villanueva's trailer home.

While waiting for Villanueva to arrive, Greenwald observed the Defendant arrive,

driving a vehicle.   [T. 27].   Greenwald again advised the Defendant that it was

unlawful for him to operate a vehicle without a driver's license, and placed him under

arrest.   The Defendant was again taken to the Stearns County Jail, where he was

booked and fingerprinted.  Subsequently, on January 4, 2006, Greenwald contacted

Becker, in order to advise him that the Defendant had used multiple names in his

interactions with the Task Force, and to inquire whether ICE had encountered the

Defendant in the past.  [T. 27].

Greenwald provided Becker with the names that had been disclosed by the

Defendant, and  Becker ran the names in the NCIC computer system. [T. 55].  The

computerized search disclosed that the Defendant had been arrested on December 8, 2005, December 30, 2005, and January 3, 2006, and it provided an alien registration number for the Defendant, which revealed that he had previously been deported.  [T. 55].  Becker subsequently transmitted, by facsimile, a detainer for the Defendant to Greenwald.  [T. 28, 55-56].  On January 5, 2006, Becker interviewed the Defendant at the Stearns County Jail.  [T. 56].  Prior to that interview, Becker  provided the Defendant with a copy of Immigration and Naturalization Service ("INS") Form 214, which is an approved  Spanish language translation of a Miranda advisory.  Upon Becker's request, the Defendant read the advisory aloud.  The Defendant then signed the waiver, which reflected that he understood his Miranda rights.[3]  [T. 58].

### III.  Discussion

A.    The Defendant's Motion to Suppress.

The Defendant's Motion to Suppress asserts that his arrest, and the subsequent search of his person, on December 8, 2005, was without probable cause, and that

---

[3]At the Hearing, the Defendant proffered Greenwald's Hearing testimony, from a State Court proceeding, for the purposes of attacking Greenwald's credibility. While a review of the transcript from the State Court proceeding discloses some discrepancies, none are material to the resolution of the pending Motions, and none are sufficient to call into question Greenwald's uncontradicted testimony at the Hearing before us, which we find to be credible.

information acquired during that arrest, and subsequent search, was used as a basis to stop the Defendant on December 30, 2005, and January 3, 2006. The Defendant also contends that probable cause was lacking to support the arrests which occurred on December 30, 2005, and January 3, 2006, and that his statement to Becker, on January 5, 2006, was taken without a valid waiver of his constitutional rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and was otherwise the fruit of his unlawful arrests.

Based on those contentions, the Defendant seeks to suppress any statements that he made to law enforcement personnel, and any other evidence obtained as a result of the three arrests in December of 2005, and January of 2006. The Defendant's Motion has specifically identified fingerprint evidence that was obtained during each of his three arrests, and evidence that was derived therefrom, as well as the statements that were made to Becker on January 5, 2006.

In addressing the Plaintiff's Motion, we turn first to the constitutionality of each of the three identified arrests. Since we find that the probable cause was lacking to support the arrest of December 8, 2005, but not the arrests of December 30, 2005, and January 3, 2006, we then address what, if any, evidence must be suppressed, as the fruit of the unlawful arrest of December 8, 2005. Lastly, we turn to the question of

whether the statement, that was taken from the Defendant, complied with the safeguards set forth in Miranda v. Arizona.

     1.     The Constitutionality of the Defendant's Arrests.

     a.     Standard of Review.   "Determining probable cause to arrest requires the court to focus on the moment the arrest was made and to ask whether 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"   United States v. Taylor, 106 F.3d 801, 803 (8th Cir. 1997), quoting Beck v. Ohio, 379 U.S. 89, 91 (1964); see also, Kiser v. Huron, 219 F.3d 814, 816 (8th Cir. 2000)("Furthermore, '[a]n officer has probable cause to make a warrantless arrest when facts known to the officer are sufficient to make a reasonably prudent officer believe that the suspect is committing or has committed an offense.'"), quoting Olinger v. Larson, 134 F.3d 1362, 1366 (8th Cir. 1998); Tokar v. Bowersox, 198 F.3d 1039, 1046-47 (8th Cir. 1999)("The existence of probable cause in fact to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy

information, were sufficient to warrant a prudent person to believe that the suspect had

committed or was committing an offense.").

We recognize, and accept, that an officer engaged in an arrest need not

personally have found probable cause in order to lawfully effect the arrest. As the

Court explained, in United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir. 2001), cert.

denied, 534 U.S. 982 (2001):

> Where officers work together on an investigation, we have
> used the so-called "collective knowledge" theory, United
> States v. Gonzales, 220 F.3d 922, 925 (8th Cir. 2000), to
> impute the knowledge of one officer to other officers to
> uphold an otherwise invalid search or seizure. Under this
> rationale, the validity of a search "may be based on the
> collective knowledge of all of the law enforcement officers
> involved in an investigation if * * * some degree of
> communication exists between them," id. See also United
> States v. Morales, 238 F.3d 952, 953 (8th Cir. 2001), and
> United States v. Twiss, 127 F.3d 771, 774 (8th Cir. 1997).
> The requirement that there be a degree of communication
> serves to distinguish between officers functioning as a
> "search team," United States v. O'Connell, 841 F.2d 1408,
> 1419 (8th Cir. 1988), cert. denied, 487 U.S. 1210, 108 S.Ct.
> 2857, 101 L.Ed.2d 893 (1988), 488 U.S. 1011, 109 S.Ct.
> 799, 102 L.Ed.2d 790 (1989), and officers acting as
> independent actors who merely happen to be investigating
> the same subject.

"'The determination of whether probable cause exists must not rest on isolated facts;

rather it depends on the cumulative effect of the facts in the totality of

circumstances.'"   <u>Tokar v. Bowersox</u>, supra at 1047, quoting <u>United States v. Everroad</u>, 704 F.2d 403, 406 (8th Cir. 1983).   We keep in mind, however, that "[p]robable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity."  <u>Id.</u>

   b. <u>Legal Analysis</u>.  As noted, the Defendant was placed under arrest on  three separate occasions.  We address the constitutionality of each of those arrests, in turn.

    1) <u>The Arrest of December 8, 2005</u>.  According to the testimony of Greenwald, the Defendant was not formally placed under arrest on December 8, 2005, until after other individuals had implicated him in narcotics related activities, [T. 29], and the booking officers discovered a quantity of cocaine in his jacket pocket.   Greenwald contended that, up until that time, the Defendant was merely being detained for questioning.   The Defendant disputes Greenwald's characterization of his detention, and appears to argue that the detention was transformed into a <u>de facto</u> arrest after he was placed in handcuffs and transported to the Stearns County Jail.  We agree.

The distinction between an investigatory detention, and an arrest, is important because, while both are seizures, and therefore, are protected by the Fourth

Amendment, "an investigative stop must only be supported by reasonable articulable suspicion that criminal activity is afoot, whereas an arrest must be supported by probable cause." United States v. Bloomfield, 40 F.3d 910, 916 (8th Cir. 1994), cert. denied, 514 U.S. 1113 (1995), quoting United States v. Miller, 974 F.2d 953, 956 (8th Cir. 1992), citing, in turn, Terry v. Ohio, 392 U.S. 1, 25-30 (1968).

"An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005), quoting, United States v. Bloomfield, supra at 916; Florida v. Royer, 460 U.S. 491, 500 (1983). "Similarly , the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id.; United States v. Willis, 967 F.2d 1220, 1224 (8th Cir. 1992). Accordingly, "[a] 'de facto arrest occurs when the officer's conduct is more intrusive than necessary for an investigative stop.'" United States v. Hill, 91 F.3d 1064, 1070 (8th Cir. 1996), quoting United States v. Bloomfield, supra at 917; see, United States v. Navarete-Barron, 192 F.3d 786, 791 (8th Cir. 1999) ("A Terry stop may turn into an arrest if the stop lasts for an unreasonably long time or if officers use unreasonable force."). In determining whether a police encounter with a citizen is a de facto arrest, our Court of Appeals has instructed as follows:

> Time is an important factor in distinguishing between an investigative stop and a de facto arrest: There is "no rigid timeline on Terry stops," United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), but a stop may be too long if it involves "delay unnecessary to the legitimate investigation of the law enforcement officers, id. at 687, 105 S.Ct. at 1576. Another factor is "the degree of fear and humiliation that the police conduct engenders. United States v. Lego, 855 F.2d 542, 544-45 (8th Cir. 1988)(citation omitted). The courts have also held that transporting a suspect to another location or isolating him from others can create an arrest. See, [United States v.] Rose, 731 F.2d [1337, 1342 (8th Cir. 1984), cert. denied 469 U.S. 931 (1984)]. Additional factors that may weigh in favor of an arrest are subjecting a suspect to unnecessary delays, handcuffing him, or confining him to a police car.

United States v. Bloomfield, supra at 917; see, United States v. Ruiz, 412 F.3d 871, 879 (8th Cir. 2005); United States v. Dixon, 51 F.3d 1376, 1380 (8th Cir. 1995); United States v. Hawkins, 59 F.3d 723, 727 (8th Cir. 1995), cert. granted, and judgment vacated on other grounds, 516 U.S. 1168 (1996).

Here, the officers effected a traffic stop of a vehicle in which the Defendant was a passenger, based upon their belief that illegal drugs were being concealed within the vehicle. As part of their investigation, the officers conducted a search of the vehicle. However, even though the search of the vehicle did not result in the discovery of any narcotics, the officers continued to detain the Defendant. During the course of that detention, the Defendant was placed in handcuffs, and was transported to the Stearns County Jail, in order to be booked, and to be questioned, presumably concerning potential drug related activities. Each of these factors weigh in favor of a de facto

- 16 -

arrest, and the Government has not presented any evidence that such intrusive measures were necessary to the conduct of the investigatory detention. Therefore, we find that, for the purposes of Fourth Amendment, the Defendant was under arrest prior to the discovery of narcotics by the booking officers.

Since the Defendant was under arrest before drugs were found on his person, we turn to the question of whether "the events leading up to the arrest * * * 'viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003), quoting Orneleas v. United States, 517 U.S. 690, 696 (1996).

Considering Cortes's involvement in the previous controlled drug transactions, as well as his representations to the CI on the date of the arrest, that he would be traveling to the Minneapolis /St. Paul area in order  to obtain methamphetamine for a third controlled transaction, and the officers' observation of Cortes's movements, which were consistent with the CI's representations, we have no doubt that probable cause was present to believe that Cortes was engaged in criminal activity, and that evidence of criminal activity was being concealed in Cortes's vehicle.

However, the Supreme Court has repeatedly instructed that "the belief of guilt must be particularized with respect to the person to be searched or seized," see,

Maryland v. Pringle, supra at 371, quoting Ybarra v. Illinois, 444 U.S. 85, 91 (1979), such that:

> [A] person's mere propinquity to others independently suspected of criminal activity does not give rise to probable cause to search that person.  Sibron v. New York, 392 U.S. 40, 62-63[, 88 S.Ct. 1889, 20 L.Ed.2d 917] (1968).  Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.  This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

Id. at 372-73, quoting Ybarra v. Illinois, 444 U.S. 85, 91 (1979).

Accordingly, our Court of Appeals has determined that the "mere association with a known or suspected criminal, or mere presence in that person's automobile, does not create probable cause to arrest."  United States v. Caves, 890 F.2d 87, 94 (8th Cir. 1989), quoting, United States v. Clark, 754 F.2d 789, 791 (8th Cir. 1985), quoting, in turn, United States v. Everroad, 704 F.2d 403, 406 (8th Cir. 1983).

Here, the officers' had probable cause to believe that Cortes was engaged in illegal narcotics activities, and that evidence of such activities would be concealed in the vehicle.  According to the testimony of Greenwald, the officers were also aware of the CI's report that Cortes intended to pick up another individual, who would likely travel with Cortes to the Minneapolis St. Paul area, in order to obtain the

- 18 -

methamphetamine.  However, Greenwald testified that the Defendant had not been observed during any of the previous controlled narcotics transactions, and that the officers did not have any contact with the Defendant prior to December 8, 2005.  [T. 33-34].  Furthermore, it does not appear that the Defendant was identified by the CI as being involved in any narcotics related activities, and neither the search of the vehicle at the scene of the traffic stop, nor any on the scene search of the Defendant's person, resulted in the discovery of any narcotics or, at least on this Record, any material that would have implicated the Defendant in any narcotics related activities.

Based on these circumstances, we find that probable cause to arrest the Defendant was lacking prior to the discovery of narcotics on his person.  In so finding, we are closely guided by the decisions of the United States Supreme Court in United States v. Di Re, 332 U.S. 581 (1948), and Maryland v. Pringle, supra, as well as the analysis of our Court of Appeals in United States v. Everroad, supra.  In Di Re, a Federal investigator was advised by an informant that the informant had arranged to purchase counterfeit gasoline coupons from a specifically identified person, at a specifically identified place.  Relying on the informant's tip, the investigator followed the informant to the designated place.  Sometime after his arrival, the investigator approached the vehicle, where he observed the informant, in the back seat, holding

two gasoline coupons, which later proved to be counterfeit.  Two persons occupied the front seat of the vehicle and, upon the investigator's inquiry, the informant stated that he had bought the coupons from the driver of the vehicle, who was the same person that he had identified in his earlier conversations with the investigator.  All three men were arrested, and a subsequent search of the passenger, who was the defendant in that case, revealed that he was in possession of counterfeit gasoline coupons.

Based on these circumstances, the Court found that probable cause to arrest the passenger of the vehicle was lacking because, at the time of the passenger's arrest, the Government had not presented any evidence that he was involved in the sale of counterfeit coupons, aside from his presence in the vehicle at the time when the transaction was believed to have taken place.  Id. at 592.  The Court further observed that "[a]ny inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person."  Id. at 593.

Similarly, in United States v. Everroad, an undercover law enforcement officer arranged a controlled purchase of narcotics from an individual identified as Bragg, at a specifically designated time and place.  On the morning of the controlled transaction, officers who were conducting surveillance outside of the residence of an individual

identified as Wenthe, who was believed to be an associate of Bragg, observed a blue Datsun pick up truck, which they later learned to belong to the defendant. Approximately twenty-five (25) minutes before the scheduled transaction, the officers observed Bragg and the defendant in the same vehicle, in the parking lot where the controlled transaction was set to occur.  The two men subsequently drove to a nearby motel, where they parked their vehicle next to a blue Datsun pickup truck, which appeared to be the same vehicle as the one that had been observed outside of Wenthe's residence earlier that morning.

Shortly thereafter, Bragg left the motel, and drove to the place where the controlled transaction was set to take place.  During the course of that transaction, Bragg provided the undercover officer with a quantity of narcotics, and he advised the officer that he would deliver the remaining amount of narcotics in approximately thirty (30) minutes.  Bragg was then arrested.  The officers subsequently drove to the motel, where they learned from the motel clerk that the blue Datsun pick up was registered to the defendant, and they arrested the defendant.  Based on those circumstances, the Court determined that probable cause to arrest the defendant was lacking, observing that "it is settled that mere association with a known or suspected

criminal, or mere presence in that person's automobile, does not create probable cause to arrest." Id. at 406.

By way of contrast, the Court, in Maryland v. Pringle, supra, found sufficient probable cause where the defendant was one of three men riding in a vehicle at 3:16 o'clock a.m.; a sum of $763.00 had been discovered in the glove compartment, which was directly in front of the defendant; narcotics were discovered behind the back seat armrest, which was accessible to each of the vehicle's three occupants; and, upon questioning, the three men failed to offer any information with respect to the ownership of the narcotics or the money. Id. at 371-72. In so holding, the Court observed that "a car passenger * * * will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or evidence of their wrongdoing," id. at 373, quoting Wyoming v. Houghton, 526 U.S. 295, 304-05 (1999), and that "it was reasonable for the officer to infer a common enterprise among the three men." Id. The Court further noted that, unlike in Di Re, "[n]o * * * singling out occurred * * *; none of the three men provided information with respect to ownership of the cocaine or money." Id. at 374.

Here, the circumstances of the Defendant's arrest are more analogous to those which were present in Everroad and Di Re, than in Pringle. As an initial matter,

unlike in <u>Pringle</u>, the search of Cortes's vehicle did not result in the discovery of any narcotics, or any other evidence of illegal narcotics related activities.  Instead, the only information that would allow for an inference that the Defendant was engaged in illegal drug activity was the report from the CI that Cortes intended to pick up another individual prior to traveling to the Minneapolis/St. Paul area, in order to obtain the methamphetamine, and the Defendant's presence in the vehicle, along with Cortes and Moreno.  On this Record, the only person who was specifically identified by the CI was Cortes and, while the officers could reasonably believe that other persons would accompany Cortes to obtain the methamphetamine, the Defendant's mere presence with Cortes, during the time period between when Cortes was believed to have obtained the methamphetamine, and the scheduled drug transaction, simply does not allow for a particularized determination that the Defendant was engaged in illegal activity under either <u>Di Re</u> or <u>Everroad</u>.  Accordingly, we find that probable cause was lacking to support the Defendant's arrest of December 8, 2005, and therefore, the arrest was unconstitutional under the Fourth Amendment.

2)   <u>The Arrest of December 30, 2005</u>.  The Defendant was arrested on December 30, 2005, for driving without a driver's license, in violation of Minnesota Statutes Section 171.02, Subdivision 1.   Greenwald learned that the

Defendant did not have a license to drive after he had approached the Defendant at a gas station, and had asked the Defendant about the status of his driver's license. While the Record is limited concerning the nature of this encounter, it does not appear that the Defendant had been seized for the purposes of the Fourth Amendment at the time that Greenwald made his inquiry.  Notably, there is nothing in the Record to reflect that Greenwald activated his squad lights, or otherwise made any show of authority towards the Defendant that would have caused him to believe that he was not free to leave, or to disregard the officer.  See, United States . Jones, 269 F.3d 919, 926 (8th Cir. 2001)("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."), quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980).

In the absence of any evidence tending to establish a show of authority, we are satisfied that, on this Record, the initial encounter between Greenwald and the Defendant,  when the officer made inquiry as to the status of the Defendant's drivers license, was consensual, and accordingly, it does not implicate the Fourth Amendment.  Id. ("A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment."), citing Florida v. Rodriguez, 469 U.S.

1, 5-6 (1984).  During the encounter, the Defendant was unable to produce a driver's license from Minnesota, or any other issuing authority, or identify any authority that had empowered him to drive, at which time Greenwald had probable cause to arrest the Defendant for driving without a license, in violation of Minnesota Statutes Section 171.02, Subdivision 1.

     3) <u>The Arrest of January 3, 2006</u>.  The arrest on January 3, 2006, was made after the Defendant was observed driving a vehicle to the residence of Villanueva.  Based on his previous arrest, the officers knew that the Defendant did not have a license to drive, and accordingly, probable cause was again present to believe that the Defendant had violated Minnesota Statute Section 171.02, Subdivision 1.

    2. <u>The Exclusionary Rule</u>.

    Finding that the arrest of December 8, 2005, lacked probable cause, we turn to the question of whether the evidence, that the Defendant seeks to suppress, could fairly be considered the fruits of the poisonous tree.  See, <u>Wong Sun. v. United States</u>, 371 U.S. 471, 487-88 (1963).  "Under the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of the police

illegality." United States v. Simpson, 439 F.3d 490, 493 (8th Cir. 2006), quoting

Hamilton v. Nix, 809 F.2d 463, 465 (8th Cir. 1987).  As our Court of Appeals recently

explained:

> Although the United States Supreme Court has refused to adopt a per se, or "but for," rule that would make inadmissible any evidence, whether tangible or live-witness testimony, where such evidence is obtained through a chain of causation that began with an illegal arrest, United States v. Ceccolini, 435 U.S. 268, 276, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), we note, once again, the familiar precept that "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." New York v. Harris, 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). Nevertheless, evidence obtained under these circumstances may be admissible if "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." United States v. Crews, 445 U.S. 463, 470, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980).

Id. at 495; see, Brown v. Illinois, 422 U.S. 590, 598-99 (1975), citing, Wong Sun v. United States, supra at 487-88; see also, United States v. Kreisel, 218 F.3d 868, 869 (8th Cir. 2000), cert. denied, 531 U.S. 916 (2000); United States v. Duffy, 796 F. Supp. 1292 (D. Minn. 1992)("A court may admit evidence that would not have been obtained but for the illegal governmental conduct if the acquisition of the illegal evidence is so attenuated as to purge the evidence of primary taint.").

"When determining whether sufficient attenuation exists, we must focus on three

specific factors:  (1) the time elapsed between the illegality and the acquisition of the

evidence; (2) the presence of intervening circumstances; and (3) the purpose and

flagrancy of the official misconduct." United States v. Simpson, supra at 495, citing Brown v. Illinois, supra at 603-04. "The mere fact that the information gained during an illegal [arrest] gives rise to a subsequent separate investigation of an individual does not necessarily taint the later investigation." United States v. Watson, 950 F.2d 505, 507 (8th Cir. 1991).

Applying these factors, we have no doubt that the narcotics, which were discovered during the search of the Defendants person on December 8, 2005, constitute the fruits of that arrest, and to the extent that the Defendant's Motion seeks to suppress such evidence, we recommend that his Motion be granted.[4] Furthermore, given the temporal proximity, and the absence of intervening factors, the fingerprints that were taken, following the arrest of December 8, 2005, were not so attenuated as to purge them of the taint of the arrest.

The Supreme Court has determined that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or

---

[4]The relevance of the narcotics that were seized from the Defendant, to the pending charge, is not immediately apparent, and it is unclear whether the Government intended to offer such evidence at Trial. However, as the Defendant's Motion seeks to suppress "any other evidence obtained as a result of his unlawful seizures and arrests," we assume that his Motion seeks to exclude such evidence.

interrogation occurred." <u>INS v. Lopez-Mendoza</u>, 468 U.S. 1032, 1039 (1984). Nevertheless, under the law of this Circuit, "identity evidence, specifically fingerprints, taken as the fruit of a Fourth Amendment violation should suppressed." <u>United States v. Perez-Perez</u>, 337 F.3d 990, 994 (8th Cir. 2003), citing <u>United States v. Guevara-Martinez</u>, 262 F.3d 751, 756 (8th Cir. 2001). Similarly, the United States Supreme Court has twice suppressed fingerprint evidence, where probable cause was lacking to support an investigatory detention for the sole purpose of obtaining fingerprint evidence, see, <u>Davis v. Mississippi</u>, 394 U.S. 721, 726 (1969); <u>Hayes v. Florida</u>, 470 U.S. 811, 816-17 (1984), and our Court of Appeals has held that, "[i]n the absence of evidence that [the defendant's] fingerprinting resulted from routine booking procedures, rather than for the purpose of pursuing INS-related proceedings against him, we conclude that the district court properly suppressed the evidence." <u>United States v. Guevara-Martinez</u>, supra at 756.

Here, the Defendant urges that, because probable cause was lacking to justify the arrest, the fingerprinting of the Defendant must have been conducted for investigatory purposes. However, such an inference is untenable, as it leaves no room for the routine taking of fingerprints following an arrest -- albeit an illegal one -- and the Record contains no evidence that the taking of the Defendants fingerprints was

motivated by the conduct of an investigation into the Defendant's immigration status, or some other criminal activity, as opposed to standard booking procedures.  As such, the circumstances presented here are materially distinguishable from those which were present in Guevara-Martinez, Davis, and Hayes, and the Defendant has failed to articulate how the purpose of the exclusionary rule -- namely, the deterrence of police misconduct -- would be advanced by suppression of fingerprint evidence under the present circumstances.   Rather, consistent with other Courts, and at least one commentator, we agree with the Supreme Court of California which, in addressing the admissibility of a photograph that was taken after an illegal arrest, observed as follows:

> To hold that all such pictures resulting from illegal arrests are inadmissible forever because they are 'fruits of the poisonous tree' would not merely permit the criminal 'to go free because the constable has blundered' (Cardozo, J., in People v. Defore (1926) 242 N.Y. 13, 21, 150 N.E. 585, 587) but would allow the criminal immunity because another constable in another jurisdiction in another case had blundered. It would in effect be giving a crime insurance policy in perpetuity to all persons once illegally arrested: if the photograph of a person obtained because of such an arrest becomes instrumental in the identification of that person for a crime committed many years later, it could be urged that **but for** the old illegal arrest the criminal would not have been identified.  Rationally, however, a 'but for' relationship alone is insufficient to render the photograph inadmissible since it cannot be said that many

- 29 -

years later the illegality of the earlier arrest was being
'exploited.'  As declared in United States v. Edmons (2nd
Cir. 1970) 432 F.2d 577, 584: 'We are not obliged here to
hold that when an arrest made in good faith turns out to
have been illegal because of lack of probable cause, an
identification resulting from the consequent custody must
inevitably be excluded.'

People v. McInnis, 6 Cal.3d 821, 826, 100 Cal.Reptr. 618, 621, 494 P.2d, 690, 693
(1972)[emphasis in original]; see, United States v. Beckwith, 22 F. Supp.2d 1270,
1292 (D. Utah 1998); 6 Wayne R. LeFave, Search and Seizure: A Treatise on the
Fourth Amendment, §11.4 (4th ed. 2004).

Similar reasoning has been applied in the context of fingerprint evidence that has been

obtained as a result of standard booking procedures.  See, Paulson v. State, 257 So.2d

303, 305 (Fla. App. 1972).   In Paulson, the Court determined that fingerprint

evidence, which was taken as a matter of course following an unlawful arrest for

public drunkenness, was admissible in a prosecution for larceny.  Id.  In so holding,

the Court distinguished Davis on the ground that the arrest for public drunkenness was

not for the sole purpose of obtaining fingerprints, and the detention of the defendant

was not  for the purposes of investigating and interrogating the defendant for another

crime.  Id.

Applying the reasoning of McInnis to the instant circumstances, we are satisfied

that, despite the absence of probable cause to support the Defendant's arrest on

December 8, 2005, the suppression of the Defendant's fingerprints following that

arrest, which were taken pursuant to routine booking procedures, would not be appropriate.   Therefore, to the extent that the Defendant's Motion seeks to suppress fingerprint evidence obtained following his arrest on December 8, 2005, we recommend that the Motion be denied.

The Defendant's Motion also seeks to suppress evidence that was obtained during the arrests of December 30, 2005, and of January 3, 2006, and specifically, fingerprint evidence that was obtained following that arrest, as well as statements that were made by the Defendant, and specifically those which were made to Becker during the interview of January 5, 2006.  In so moving, the Defendant urges that the stops, and arrests, on December 30, 2005 and January 3, 2006, as well as statements that were made to law enforcement authorities, including the statement of January 5, 2006, were predicated on tainted information arising from the arrest of December 8, 2005.

Applying the factors that were identified in Brown, neither the arrest of December 30, 2005, nor that of January 3, 2006, nor any evidence that was derived therefrom, could fairly be considered the fruits of the arrest on December 8, 2005.  As an initial matter, the discovery of evidence during the encounters between law enforcement and the Defendant, on December 30, 2005, and January 3, 2006, and the

illegal arrest of December 8, 2005, were temporally distant.  Moreover, intervening circumstances were present, such as the Defendant's release from custody several weeks prior to the encounters on December 30, 2005, and January 3, 2006, see, <u>Wong Sun v. United States</u>, supra at 491 (a statement which was given several days after the defendant had been released from custody was untainted by prior illegal arrest), and the officer's observation of the Defendant engaging in potentially unlawful conduct -- driving a vehicle without a driver's license -- shortly before each of the police encounters.  See, <u>United States v. Watson</u>, supra at 508 ("[W]here a law enforcement officer merely recommends investigation of a particular individual based on suspicions arising serendipitously from an illegal search, the causal connection is sufficiently attenuated so as to purge the later investigation of any taint from the original illegality.").

Furthermore, despite the absence of probable cause prior to the arrest of December 8, it does not appear that the officers acted purposefully or flagrantly in violating the Defendant's rights.   Notably, at the time of the traffic stop, it was certainly permissible for the officers to investigate potential narcotics related activity, and while the officers conduct exceeded the bounds of a permissible investigation, there has been no suggestion that the officers mistreated the Defendant, who was

- 32 -

released on the same day, or that the officers had knowledge that their conduct towards the Defendant was unconstitutional. See, United States v. Simpson, supra at 496 (noting that absence of evidence that officer acted with knowledge that his conduct was likely unconstitutional suggested that officer did not act purposefully and flagrantly). Accordingly, we also find that the absence of purposeful and flagrant conduct, on the part of the officers, weighs against the application of the exclusionary rule to the arrests on December 30, 2005, and January 3, 2006.

In addition to the arrests of December 30, 2005, and January 3, 2006, the Defendant also seeks to suppress statements that were obtained during an interview with Becker, on January 5, 2006. The interview occurred while the Defendant was in lawful custody, pursuant to the detainer that had been issued by ICE.[5] As such, the circumstances of the Defendant's statement appears to be analogous to those in New York v. Harris, 495 U.S. 14, 20 (1991), in which the Court held that, "where police have probable cause to arrest a suspect, the exclusionary rule does not bar the [Government's] use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton

---

[5]The events which gave rise to the "detainer" -- namely, Greenwald's conversation with Becker -- also occurred while the Defendant was in lawful custody, pursuant to his arrest on January 3, 2006.

[v. New York, 445 U.S. 573 (1980)]."  In so holding, the Court declined to apply the Brown factors since, emphasizing that the defendant's custody was lawful, it could not be established that "the challenged evidence [was] in some sense the product of illegal governmental activity."  Id. at 19, quoting United States v. Crews, 445 U.S. 463, 471 (1980).   Applying the reasoning of Harris, and recognizing that the Plaintiff was in lawful custody at the time of his interview, as well as during the events which gave rise to the issuance of the detainer, the interview cannot responsibly be considered the product of the illegal arrest on December 8, 2005.

Moreover, even assuming that the Defendant could establish that his statements were the product of the arrest of December 8, 2005, we would, nonetheless, be compelled by the application of the Brown factors to conclude that the exclusionary rule is inapplicable to the Defendant's statements to Becker.  As previously noted, the interview occurred several weeks after the illegal arrest, and his initial release from custody.  Moreover, while the arrest of December 8, 2005, was effected without probable cause, the Record does not support a conclusion that the officers acted purposefully and flagrantly in their conduct towards the Defendant.

In urging suppression based on the Fourth Amendment violation of December 8, the Defendant appears to place significant weight on the admission of Greenwald

that his inquiry, on December 30, 2005, as to whether the Defendant had obtained a valid driver's license, was based on information that he had learned during the arrest of December 8, when the Defendant presented identification in the form of an International Driving Document.  However, we do not think that the illegality of that arrest required Greenwald to turn a blind eye to subsequent criminal conduct by the Defendant.   Notably, the purpose of the exclusionary rule is to deter police misconduct, while preserving judicial integrity, and such a purpose is not advanced by prohibiting an officer from investigating subsequent criminal activity by an offender, even where the officer's investigation is based, in part, on knowledge that was acquired during a prior illegal arrest.  Accordingly, the Defendant's interpretation of the exclusionary rule would be tantamount to affording immunity to an individual who was once unlawfully arrested, for subsequent criminal acts -- a result which is clearly not contemplated by Fourth Amendment jurisprudence.  See, United States v. Watson, supra at 508; United States v. Liss, 103 F.3d 617, 621 (7th Cir. 1997)("[T]o grant life-long immunity from investigation and prosecution simply because a violation of the Fourth Amendment first indicated to the police that a man was not the law-abiding citizen he purported to be would stretch the exclusionary rule beyond

tolerable bounds."), quoting United States v. Friedland, 441 F.2d 855, 861 (2nd Cir. 1971).

      3.    The Validity of the Miranda Waiver.

      a)    Standard of Review.   Government agents are not required to administer Miranda warnings to everyone they question.  See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).   Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984).

If a person is subjected to a custodial interrogation, he or she "has the right to consult with an attorney and to have counsel present during questioning."  Davis v. United States, 512 U.S. 452, 457 (1994).  To exercise that right, however, a suspect "must unambiguously request counsel," which "'requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"  Id. at 459, quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991).  Furthermore, "if a suspect makes a reference to an attorney that is

ambiguous or equivocal * * * [such] that the suspect **might** be invoking his right to counsel, our precedents do not require the cessation of questioning." Id. [emphasis in original]. In addition, "the Sixth Amendment right to counsel 'does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Von Kahl v. United States, 242 F.3d 783, 789 (8th Cir. 2001), quoting McNeil v. Wisconsin, supra at 175.

"The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'" Davis v. United States, supra at 458, quoting Edwards v. Arizona, supra at 483. Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him." Id., citing North Carolina v. Butler, 441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994). The burden rests with the Government to prove, by a preponderance of the evidence, that the Defendant knowingly and voluntarily waived his Miranda rights. See, Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Dougherty, 810 F.2d 763, 773 (8th Cir. 1987). However, "Miranda has no application to statements

* * * that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response." United States v. Griffin, 922 F.2d 1343, 1357 (8th Cir. 1990), citing United States v. McGauley, 786 F.2d 888, 891 (8th Cir. 1986), and United States v. Webster, 769 F.2d 487, 492 (8th Cir. 1985).

Further, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.] See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945)("If all the attendant circumstances indicate that the confession was

>coerced or compelled, it may not be used to convict a
>defendant").   The determination "depend[s] upon a
>weighing of the circumstances of pressure against the
>power of resistance of the person confessing."   Stein v.
>New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and

foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507

U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly,

479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee,

322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367

U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v.

Denno, 347 U.S. 556, 561 (1954).   See also, Withrow v. Williams, supra at 693

(listing the applicable considerations).

   b. Legal Analysis. Prior to the interview on January 5, 2006, Becker

provided the Defendant with a copy of INS Form I-214, which is an approved Spanish

translation of a Miranda advisory.   The Defendant read the advisory aloud to Becker,

then signed the form, thus acknowledging that he understood his rights.   There has

been no suggestion that any coercive tactics were employed by Becker, or any other

Agent or officer, to obtain the waiver, or that the Defendant was somehow incapable

of understanding the advisory.   Accordingly, the Government has satisfied its burden

of showing that the Defendant's waiver of his <u>Miranda</u> rights was knowing, intelligent, and voluntary.[6]   The Defendant offers nothing to support a showing that he was forced to waive his right to silence by any threats or promises, or that any other form of coercion prompted his waiver.

In sum, we find that the arrest of December 8, 2005, was effected without probable cause, but that the arrests of December 30, 2005 and January 3, 2006 were fully supported by probable cause, and were not otherwise the fruits of the arrest of December 8, 2005.  We also find that the Defendant's statement to Becker on January 5, 2006 was voluntary, and that it was not the product of the arrest of December 8, 2005.   Accordingly, we recommend that the Defendant's Motion to Suppress be granted, in part, to the extent that he seeks to suppress drug evidence which was obtained during a search of the Defendant on December 8, 2005, and denied in all other respects.

---

[6]The Defendant's Motion also seeks to exclude "any statements which were obtained by law enforcement in this matter and which, due to the nature and circumstances under which the statement was made, was involuntary or otherwise inadmissible." <u>Defendant's Motion to Suppress</u>, at ¶4.  However, the Defendant does not identify any assertedly involuntary statements, nor are any such statements immediately discernable from the Record.

B.   <u>The Defendant's Motion to Dismiss</u>.

As noted, the Defendant has been charged with Illegal Re-Entry After Deportation, in violation of Title 8 U.S.C. §§1326(a) and 1326(b)(2).   In pertinent part, Section 1326(a) provides, as follows:

> Subject to subsection (b) of this section, any alien who--
>
> (1)   has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter
>
> (2)   enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or
>
> (B)   with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,
>
> shall be fined under Title 18, or imprisoned not more than 2 years, or both

In turn, Section 1326(b)(2) states as follows:

> Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection--

> (2)     whose removal was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such Title, imprisoned not more than 20 years, or both;

In this Motion, the Defendant seeks to Dismiss the Indictment to the extent that it charges him with a violation of Title 8 U.S.C. §1326(b)(2), upon the assertion that the Washington State Court conviction of May 10, 1993, which is identified in the Indictment, was obtained in violation of the Defendant's Federal constitutional right to due process and to the assistance of counsel.[7]

The Defendant concedes that, under existing Circuit precedent, the Government need not plead nor prove a prior conviction as an element of the offence under Section 1326(b)(2).  However, the Defendant contends that the subsequent decisions of the United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466 (2000), Shepard v. United States, 544 U.S. 13 (2005), and United States v. Booker, 543 U.S. 220 (2005), require a re-examination of Circuit precedent, such that the Government must now be required to plead and prove a prior conviction under Section 1326(b)(2), in order to comply with the requirements of the United States Constitution.

---

[7]The Defendant acknowledges that Court-appointed counsel was provided to him in the criminal proceedings which resulted in the conviction at issue, but he contends that the failure of counsel, in that action, was tantamount to the complete absence of counsel.

The Defendant also contends that, "[b]ecause the existence of the prior conviction must be plead and proved by the Government, a collateral challenge to the validity of the prior conviction must be allowed," irrespective of the Supreme Court's holding in Custis v. United States, 511 U.S. 485 (1994), which bars the collateral review of prior State Court convictions in the context of sentencing, absent the denial of the right to counsel.  Defendant's Motion to Dismiss, at ¶4.  It is through such a collateral challenge to his conviction of May 10, 1993, that the Defendant seeks to dismiss Section 1326(b)(2) from the Indictment.

As recognized by the Defendant, the Supreme Court has directly addressed the pleading requirements of Section 1326(b)(2), in Almendarez-Torres v. United States, 523 U.S. 224, 235 (1998), where the Court determined that recidivism, under Section 1326(b)(2), was a sentencing factor, as opposed to an element of the offense. Therefore, the Court held that the existence of a prior conviction need not be written in an Indictment, or proved to a Jury.  Id. at 247.  However, the Defendant contends that the subsequent rulings in Apprendi, Shepard, and Booker, concerning the Sixth Amendment right to a Jury, have undermined Almendarez-Torres to the extent that sentencing factors, including the fact of a prior conviction, must be pled in an Indictment and proved to a Jury.  See, Apprendi v. New Jersey, supra at 520-21

- 43 -

(Thomas J., concurring); <u>Shepard v. United States</u>, supra at 1264 ("[A] majority of the Court now recognizes that Almendarez-Torres was wrongly decided.")(Thomas J., concurring).

As a Court of inferior jurisdiction, we are bound to follow "what the Supreme Court **has said**, not guess what it **might** say in the future," <u>United States v. Langford</u>, 155 Fed. Appx. 936, 938 (8th Cir., November 17, 2005)[Emphasis in original], quoting <u>United States v. Maynie</u>, 257 F.3d 908, 918 (8th Cir. 2001).  As such, neither the holdings in <u>Apprendi</u>, <u>Booker</u>, and <u>Shepard</u>, nor precedent from our Circuit, supports an implicit abrogation of <u>Almendarez-Torres</u>.  While the Court in <u>Apprendi</u> recognized that "it is arguable that Almendarez-Torres was wrongly decided," <u>id.</u>, at 489, it also specifically held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Id.</u> at 490.  In so holding, the Court preserved <u>Almendarez-Torres</u> by exempting the fact of a prior conviction from the general rule that sentencing enhancements, which may result in a sentence beyond the statutory maximum, must be proved to a Jury.

Furthermore, our Court of Appeals has frequently considered the effect of <u>Apprendi</u>, <u>Shepard</u>, and <u>Booker</u>, on the fact of a prior conviction, and on each

occasion, has characterized <u>Almendarez-Torres</u> as binding precedent.  See, <u>United States v. Gamboa</u>, 439 F.3d 796, 815 (8th Cir. 2006)("<u>Almendarez-Torres v. United States</u>, * * * is still the law."), citing <u>United States v. Levering</u>, 431 F.3d 289, 295 (8th Cir. 2005), <u>United States v. Carrillo-Beltran</u>, 424 F.3d 845, 848 (8th Cir. 2005), cert. denied, --- U.S. ---, 126 S.Ct. 1384 (2006), and <u>United States v. Torres-Alvarado</u>, 416 F.3d 808, 810 (8th Cir. 2005); see, <u>United States v. Perry</u>, 437 F.3d 782, 787 (8th Cir. 2006); <u>United States v. Landers</u>, 417 F.3d 958 (8th Cir. 2005)("<u>Almendarez-Torres</u> remains the governing law which we must follow."); <u>United States v. Johnson</u>, 408 F.3d 535, 540 (8th Cir. 2005)("The Supreme Court has never overruled its decision in Almendarez-Torres, and Shepard did not alter the rule that a court may consider prior criminal history as a sentencing factor.").

Recognizing the continued validity of <u>Almendarez-Torres</u>, it is clear that the Defendant's prior conviction is not an element of the offense for which he is charged, and therefore, it need not be pled or proved to the Jury under Section 1326(b)(2).  See, <u>Almendarez-Torres v. United States</u>, supra at 246; see also, <u>United States v. Langford</u>, supra at 938 ("[A] prior felony conviction is a sentencing factor and not a separate offense and it therefore does not need to be pled in the indictment or put to a jury."), quoting <u>United States v. Thomas</u>, 398 F.3d 1058, 1063 (8th Cir. 2005).  Instead, the

Defendant's prior conviction is a sentencing factor, which could be used to enhance the Defendant's sentence, in the event that he is ultimately convicted of the crime charged.  Id.; see, e.g., United States v. Torres-Alvarado, supra at 810.

As noted, the Defendant's Motion seeks to Dismiss Section 1326(b)(2) from the Indictment, on the ground that the underlying conviction was obtained in violation of his Federal constitutional rights, and because the underlying conviction does not constitute an aggravated felony for the purposes of Section 1326(b)(2).  Given the continued validity of Almendarez-Torres, the Defendant's Motion is premature, in that it essentially asks that we dispose of a sentence enhancing provision, which is applicable to the underlying charge of Section 1326(a), prior to a finding of guilt by a Trial on the merits.  Since such matters are routinely reserved to the Sentencing Court, if the Defendant is convicted of a crime to which the sentencing enhancement would apply, we recommend that the Defendant's Motion be denied, but without prejudice to its renewal at the time of sentencing if a guilty Verdict is returned by the Jury.[8]

---

[8]While we recommend that the Plaintiff's Motion be denied without prejudice, we note that several  Courts have determined that Custis v. United States, 511 U.S. 485 (1994) remains viable, even in the wake of Apprendi, Booker, and Shepard, and that, aside from an outright denial of the right to counsel, a Defendant may not
(continued...)

D. <u>The Defendant's Motion to Strike</u>.

In the alternative to his Motion to Dismiss, the Defendant requests that the Court strike, as surplusage, language in the Indictment which references his prior conviction, since the prior conviction is not an element of the offense, and need not be submitted to the Jury. The Government opposes the Defendant's Motion, as premature, and on the ground that inclusion of the prior conviction in the Indictment serves to place the Defendant on notice of the possible sentencing enhancement.

As an initial matter, Rule 12(b)(3)(B), Federal Rules of Criminal Procedure, requires that Motions "alleging a defect in the indictment or information" be raised before Trial. Plainly, the Defendant's Motion to Strike, which alleges a defect in the Indictment, falls within the ambit of that Rule, and similar Motions to strike language from an Indictment are frequently addressed at the pretrial stage. See, e.g., <u>United States v. Prime Plating, Inc.</u>, 2004 WL 2801595 (D. Minn., November 24, 2004); <u>United States v. Mickle</u>, 2004 WL 2302865 (D. Minn., October 12, 2004). Therefore,

---

[8](...continued)
collaterally attack a prior conviction which is being used as a sentencing enhancement. See, <u>United States v. Claudillo-Marquez</u>, 165 Fed.Appx. 43, 46 (2nd Cir., January 30, 2006); <u>United States v. Moreno-Delgado</u>, 127 Fed.Appx. 854, 857-58 (6th Cir., April 18, 2005); see also, <u>United States v. McElrath</u>, 133 Fed.Appx. 338, 341 (8th Cir., May 24, 2005); <u>United States v. Rodriguez-Ceballos</u>, 365 F.3d 664, 666 (8th Cir. 2004).

contrary to the Government's assertion, our consideration of the Defendant's Motion, at this pretrial stage, is proper.

A Motion to Strike surplusage from an Indictment is a matter within the Court's discretion. United States v. Figueroa, 900 F.2d 1211, 1218 (8th Cir. 1990), citing Dranow v. United States, 307 F.2d 545, 558 (8th Cir. 1962); see also, United States v. Anderson, 579 F.2d 455, 456 n. 2 (8th Cir. 1978), cert. denied, 439 U.S. 980 (1978). Further, "a motion to strike surplusage from an indictment 'should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter.'" United States v. Figueroa, supra at 1218, quoting Dranow v. United States, supra at 558.

For reasons that have previously been discussed, the fact of a prior conviction is a sentencing factor that need not be pled in an Indictment, or proved to a Jury. As such, at least one Court has determined that "the copy of the indictment which accompanies the jurors to their deliberations should not include [prior conviction] language," and that, "as the fact of prior conviction is merely a sentencing factor, not an element of the offense, it is neither necessary nor appropriate for the United States to present to the jury evidence of prior convictions." United States v. Batchelder, 2005 WL 3050472 at *2 (W.D. Ky., November 15, 2005).

- 48 -

While the Court in <u>Batchelder</u> ultimately determined that it was unnecessary to formally strike a prior conviction from the Indictment, <u>id.</u>, Courts from other jurisdictions have granted Motions to strike similar sentencing allegations, often without opposition from the Government. See, <u>United States v. Grieveson</u>, 110 F. Supp.2d 880, 885 (S.D. Ind. 2000); <u>United States v. Nwene</u>, 20 F. Supp.2d 716, 723 (D. N.J. 1998); see also, <u>United States v. Godinez-Rabadan</u>, 289 F.3d 630, 631 (9th Cir. 2002)(noting that the District Court had granted the defendant's Motion to strike as surplusage references to Section 1326(b), and to the defendant's prior aggravated felonies); <u>United States v. Rodriguez-Manguia</u>, 1997 WL 329557 at *2 n. 5 (10th Cir., 1997)(same); cf. <u>United States v. Jones</u>, 30 Fed.Appx. 924, 925-26 (10th Cir. 2002) (finding that prior felony in Indictment was surplusage and relevant only to sentencing). The holdings of those Courts are consistent with the law of this Circuit, which treats sentencing allegations as surplusage. See, <u>United States v. Sherman</u>, 440 F.3d 982, 986 (8th Cir. 2006), citing <u>United States v. Bates</u>, 77 F.3d 1101, 1105 (8th Cir 1996), cert. denied, 519 U.S. 884 (1996).[9]

---

[9]The Court in <u>United States v. Bates</u>, 77 F.3d 1101, 1105 (8th Cir. 1996), cert. denied, 519 U.S. 884 (1996), determined that, "[a]lthough surplusage, [references to sentencing enhancements] in the indictment 'serves a valid and useful purpose in that it gives notice to the defendant from the start that the government intends to seek the

(continued...)

Evidence of prior convictions, though often relevant, are inherently prejudicial. See, Old Chief v. United States, 519 U.S. 172, 180-182 (1998). Therefore, since the fact of the Defendant's prior conviction is not relevant to the crime charged -- namely, re-entry after deportation in violation of Section 1326(a) -- we agree with those Courts which have struck, as surplusage, references to a defendant's prior conviction, and Section 1326(b), from an Indictment, at least for the purposes of presenting the Indictment to the Jury. See, United States v. Batchelder, supra at *2; United States v. Grieveson, supra at 885; United States v. Nwene, supra at 723. As a consequence, we recommend that the Defendant's Motion be granted, to the extent that references to Section 1326(b), as well as the Defendant's prior conviction, should be stricken from the copy of the Indictment that is presented to the Jury. In so recommending, we do not suggest that the Sentencing Court refrain from considering the prior conviction,

---

[9](...continued)
enhanced sentence if the defendant is convicted.'" Id., quoting United States v. Washington, 992 F.2d 785, 787 (8th Cir. 1993, cert. denied, 510 U.S. 936 (1993). While such language tends to support the Government's argument in opposition to the Defendant's Motion, the circumstances in Bates -- where the defendant challenged the application of a sentencing enhancement in the absence of any citation to that enhancement in the Indictment -- are clearly distinguishable from the present case, where the Defendant has already been put on notice of the potential application of Section 1326(b)(2). See, United States v. Mutchler, 333 F. Supp.2d 828, 833 (S.D. Iowa 2004)(distinguishing Bates).

should Defendant be convicted, and we intimate no opinion on whether the Defendant's prior conviction might otherwise be admissible at Trial.  See, <u>Rule 404(b), Federal Rules of Evidence</u>.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Defendant's Motion to Suppress [Docket Nos. 11 and 18] be granted, in part, and denied, in part, as further directed in the text of this Report and Recommendation.

2.      That the Defendant's Motion to Dismiss [Docket No. 21] be denied, but without prejudice.

3.      That the Defendant's Motion to Strike [Docket No. 25] be granted, as further directed in the text of this Report and Recommendation.

Dated: May 10, 2006                         s/Raymond L. Erickson
                                            Raymond L. Erickson
                                            CHIEF U.S. MAGISTRATE JUDGE

- 51 -

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than May 26, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than May 26, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.